IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTWAYNE QUARRELS,<br><br>                Petitioner,<br><br>    vs.<br><br>D. K. SISTO, Warden, California State Prison Solano,<br><br>                Respondent. | No. 2:09-cv-01782-JKS<br><br>MEMORANDUM DECISION |

      Petitioner Antwayne Quarrels, a state prisoner appearing *pro se*, filed a Petition for Habeas Corpus Relief Under 28 U.S.C. § 2254.  Quarrels is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the California State Prison Solano.  Respondent ("State") has answered, and Quarrels has replied.  Quarrels has requested an evidentiary hearing.

I.  EVIDENTIARY HEARING

      Ordinarily, a federal habeas proceeding is decided on the complete state-court record and a federal evidentiary hearing is required only if the trier of fact in the state proceeding has not developed the relevant facts after a full hearing.[1]  It does not appear from the record that the California courts made any independent evidentiary findings, and review in this case is based upon the findings of the Board, which did hold a full hearing developing the facts.  Quarrels has

---

[1] *Townsend v. Sain*, 372 U.S. 293, 312-13, 319 (1963), *overruled on other grounds by Keeny v. Tamayo-Keyes*, 504 U.S. 1 (1992), *superceded in part by statute*, 28 U.S.C. 2254(e)(2) (1996).

not identified any factual conflict that would require this Court to hold an evidentiary hearing to resolve.  The request for an evidentiary hearing is, therefore, DENIED.

## II.  BACKGROUND/PRIOR PROCEEDINGS

In June 1990, following a jury trial, Quarrels was convicted in the Solano County Superior Court of Murder in the Second Degree (Cal. Penal Code § 187), with the use of a firearm enhancement (Cal. Penal Code §§ 12022, 12022.5).  The trial court sentenced Quarrels to a prison term of 15 years to life on the murder conviction and a determinate prison term of two years on the firearm use enhancement, to be served consecutively.  Quarrels does not challenge his conviction or sentence in this proceeding.

In July 2007 Quarrels appeared before the California Board of Parole Hearings ("Board") for a parole-suitability hearing.  The Board, after determining that Quarrels continued to present an unreasonable risk of danger to society or a threat to public safety, found Quarrels unsuitable for parole and denied parole for a period of two years.  Quarrels timely filed a petition for habeas relief in the Solano County Superior Court, which denied his petition in an unpublished, reasoned decision on April 2, 2008.  Quarrels subsequently filed a petition for habeas relief in the California Court of Appeal, First Appellate District, which was summarily denied without opinion or citation to authority on September 19, 2008.  Quarrels's petition for habeas relief in the California Superior Court was summarily denied without opinion or citation to authority on April 15, 2009.  Quarrels timely filed his Petition for relief dated April 28, 2009, in this Court on June 29, 2009.

On direct appeal, the California Court of Appeal, First Appellate District, summarized the facts of the underlying crime:

On July 23, 1989 in the early morning hours, at the All Star Inn Motel in Vallejo, Alicia Roden was shot and killed as she stood on the motel balcony. The prosecution's theory was that her death was the unintended, culminating event of an earlier and escalating altercation between two groups of young men.

On July 22, 1989, Mr. Quarrells learned that his stepbrother and cousin had been killed in St. Louis

Later that day, Mr. Quarrells got together with a group of friends to go to the All Star Inn in Vallejo. Along with Mr. Quarrells were Latoris Reynolds, Kevin West, Thomas Higgins, Willis Odom, George Boatwright (aka George Butler), and Stacey Butler.[9] Stacey Butler lived in Vallejo, but the other men lived in Richmond or Rodeo. The group went to the motel in Stacey Butler's car.

9/ Mr. Higgins, Mr. Odom, and Stacey Butler all testified at trial.

When the group got to the motel, at about 9:00 p.m., they pooled their funds and rented a room. Mr. Quarrells testified that his purpose in going there was to "smoke and drink," in order to get "the stress out off my mind" in relation to the deaths of his two relatives.

Stacey Butler, however, admitted that his purpose in going to the motel was to sell drugs. Stacey lived in Vallejo and sold drugs at the motel on weekends. [On previous occasions, Stacey had always gone to the motel alone to sell drugs.]

Another group of men also had a room at the motel, rented in the name of Eric Broussard. A couple of friends of his, including Clifford Koot, were "visiting" Mr. Brossard at the motel.

Calvin Anderson, a relative by marriage to Ms. Roden, testified that Mr. Broussard was a member of the Blood gang and that he knew Broussard "through drugs." Broussard testified that the "Vallejo people [Broussard and Koot's group] had a feud with the Richmond people [George and Stacey Butler's group]."

As Mr. Quarrells and his friends walked towards their room on the second floor, Kevin West accidentally knocked over Clifford Koot's beer, which was sitting on the floor. Clifford Koot became upset because no one apologized for having spilled his beer.

There was conflicting testimony as to what happened next between the two groups. Mr. Koot, who had three previous felony convictions, testified that he called to his friends just to "let them know I was there." Koot testified that the Quarrells group had been standing there as if they were "ready to fight." Koot alleged that, as his friends came to his aid, the other group began to back away from him as he "charged" them. Koot described having pushed one person in the face, whereupon the Quarrells group left. According to Koot, he and his companions then returned to Broussard's room in the motel.

Mr. Quarrells, Stacey Butler, Willis Odom, and Thomas Higgins testified that, after the beer spilled, Koot called out to his friends the signal "3-1," whereupon more than dozen of his friends came to his aid. Mr. Quarrells and his friends testified that, during the altercation with the Koot group, someone among

3

Koot's friends said something to the effect of, "Go get the guns," or, "Go get the gats." Some person from the Broussard-Koot group picked up a garbage can and threw it at the Quarrells group, hitting Mr. Higgens [sic].

Although Koot had mentioned merely pushing someone in the fact [*sic*], Mr. Broussard, in his preliminary hearing testimony read to the trial jury, recalled that Koot had punched one of the other group.

Quarrells and his friends got in Stacey Butler's car and left the motel, heading for Richmond. Quarrels admitted being angry with Koot for punching his friend. He denied, however, that he ever wanted to kill him.

In Richmond they went to a house and got some guns. No one was sure whose house it was. They headed back toward Vallejo, with the guns in the trunk. They stopped near the Vallejo bridge and got the guns from the trunk.

Mr. Quarrells claimed he first saw the guns in the car when they stopped near the Vallejo bridge. He believed they belonged to Stacey Butler. Mr. Quarrells claimed to have seen four guns: a shotgun, a .357 Magnum handgun, a .22 caliber revolver, and a .25 caliber pistol.

Stacey Butler claimed he only saw the .25 or the .22. Butler admitted he owned the .357 Magnum but claimed he did not see it the day of the shooting.

Stacey Butler testified that George Boatwright had the .25 and that he didn't see who had the shotgun. Stacey was driving, with George sitting next to him. Stacey did not know where Mr. Quarrells was sitting.

Willis Odom testified that he, Thomas Higgins, Kevin West, and Latoris Reynolds were all in the back seat, with the shotgun. Stacey was driving, George was in the front center, and Mr. Quarrells was in the front right seat. He saw two handguns in the front seat. [Thomas Higgins also testified to having been in the back seat with the shotgun. He saw three handguns.]

Mr. Quarrells testified at trial that he had the .25 caliber for protection, because the Koot group had "pulled guns on [them] earlier." Mr. Quarrells alleged they had gone back to the motel simply to return to their room, and not to look for Mr. Koot. Mr. Higgins verified that their reason for returning had been merely to go to their room.

On their way into the front entrance of the motel, Mr. Stacey stopped the car, and there was a conversation with a motel security guard, Mr. Phillips. Mr. Quarrells felt, based on what Phillips said to them, that they were being "set up."

According to Mr. Quarrells, he heard shots fired as they drove along the front of the motel. He then saw Mr. Koot standing on the balcony. Mr. Quarrells testified that he shot back with the .25 automatic from the front seat. Mr. Quarrells testified that he could not say whether he fired the .357. He denied knowing anyone was hurt by the shooting.

According to Stacey Butler, a shot was indeed fired from outside, and someone in the car fired the .25 and the shotgun in response some five or ten seconds later. Stacey recalled that George had held the .25, but he was not sure who had been in possession of the shotgun.

4

At trial, Stacey Butler testified further that he never saw the .357 handgun in the car that day and that he did not see anyone other than George Boatwright fire a gun. Mr. Butler also testified that he had not heard Mr. Quarrells say anything after the shooting. He admitted an earlier statement to Detective Jackson that Mr. Quarrells had said after the shooting that he had shot "him" and a girl. However, Stacey explained that he had told this to police only because "the paper said that he [Quarrels] shot the girl."

William Odom testified that he thought Tony Quarrells had the "silver gun" (referring to the .357). Odom thought Quarrells fired the first shot, but he wasn't sure. He also testified that the first shot came from the front seat, that he didn't see who had fired it, that he didn't know who had fired from the front seat, and that all he knew was that there had been the sounds of a "bunch of guns." He denied that Mr. Quarrels had said anything after the shooting, or that anyone had said anything like, "You dropped one."

[Detective Causey later testified regarding a conversation he had with Mr. Odom after his arrest. According to Causey, Odom stated that Quarrels shot first, using the .357, and that Mr. Quarrells had said after the shooting, "We dropped one."]

Thomas Higgins testified he heard gunshots and ducked down. He could not tell where the shots originated.

Clifford Koot testified that he was standing and talking to Alicia Roden on the motel balcony where the earlier confrontation had taken place. Koot saw a vehicle approaching and a silver-colored gun pointed out one of the car windows. He heard a shot and then dove to the ground, pulling Alicia down with him. He then heard several more shots, among them one or two shotgun blasts. When he got up, he noticed Alicia lying on her back.

The Quarrells group left the motel and drove towards Richmond. The car was chased by the police until it pulled off at a dead end street where its occupants fled. Quarrells was arrested hiding in some bushes.

The arresting officer testified that Mr. Quarrels provided him with identification of the others involved. All except Willis Adorn were arrested a few hours later.

The .357 Magnum was found in the right front floorboard area of the car. Other weapons were found in or near the car.

There was substantial trial testimony relative to Mr. Quarrells' level of intoxication that evening. A detective who interviewed Mr. Quarrells after his arrest testified that Mr. Quarrells had told him he had been smoking marijuana that night but not drinking. Mr. Quarrells told the detective many times that he had been "really loaded."

Stacey Butler described seeing Mr. Quarrells smoking and drinking that night: when they returned to the motel, everyone was drunk. Mr. Odom testified that he, personally, had drunk a lot and that he had seen Mr. Quarrels smoking weed. Mr. Higgins testified that Mr. Quarrells had been drinking beer and smoking "a lot" of weed: Mr. Quarrells had been intoxicated.

5

  Mr. Quarrells in his testimony described having drunk a pint of Hennessy that day, and later two 40-ounce beers. He had also smoked marijuana.
  Officer Coelho testified that he had arrived at the scene of Mr. Quarrells' arrest at 1:55 a.m. In Coelho's opinion, Quarrells was not under the influence of alcohol or marijuana.
  Sergeant Jackson testified that he was the primary investigator on this homicide. Jackson had four conversations with Quarrells, including one at 3:00 a.m. in the back of Officer Coelho's car. Jackson took a recorded statement from Mr. Quarrells at the police station at 1:00 p.m. the next afternoon. Initially Mr. Quarrels had denied having fired the .357, alleging that George Boatwright had shot that gun. However, Jackson eventually got Mr. Quarrells to state he had shot the .357, based upon information provided by Stacey Butler that Quarrells was the "shooter." At first, Mr. Quarrells stated that he had fired the gun once, and then laid it down. When the officer asked if it was possible that he had fired the gun more times, Mr. Quarrells has relied [*sic*] that he didn't know and that he had been "real loaded." When Mr. Quarrells was asked if he could have fired the gun four times, he responded, "I don't care, whatever." Elsewhere in the interview Mr. Quarrells stated that he had been so loaded that he was not sure where he had been seated in the car. Mr. Quarrells eventually stated that he had fired the .357 six times, intending only to hit Mr. Koot in the leg. However, the entire question of the ,357 [*sic*] was thrown into question when the detective testified that, when he had shown Mr. Quarrells a photograph of the .357, Mr. Quarrells had replied, "I though [*sic*] it was little."[2]

After briefing in this case was completed, the United States Court of Appeals for the Ninth Circuit, sitting en banc, decided *Hayward v. Marshall*.[3] At Docket No. 17 this Court entered an Order directing the parties to file supplemental briefs addressing the *Hayward* decision, in particular that "[t]he prisoner's aggravated offense does not establish current dangerousness 'unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state supports the inference of

---

[2] Docket No. 12-1, pp. 105-113 (references to the trial court record omitted).

[3] 603 F.3d 546 (9th Cir. 2010) (en banc).

dangerousness."[4]  This Court also directed the parties to consider two Ninth Circuit Decisions applying *Hayward*.[5]  Both parties have submitted supplemental briefing.

### III.  GROUNDS RAISED/DEFENSES

Although Quarrels has divided his Petition into four separate grounds, they can be conflated into a single ground:  that the finding that he posed an unreasonable risk of danger to society or a threat to public safety, and was, therefore, unsuitable for parole, is unsupported by sufficient evidence.  Respondent has not raised any affirmative defense.[6]

### IV.  DISCUSSION

In finding Quarrels unsuitable for parole, the Board made the following findings:

> **PRESIDING COMMISSIONER BRYSON:**  And the time is now 1423. We've reconvened for the decision in the matter of Antwayne Quarrels and all parties have returned to the room.  Sir, the panel reviewed all the information received from the public and from you and relied on the following circumstances concluding that you are not yet suitable for parole.  And would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  This offense was carried out cruelly and callously.  In the early morning hours of July 23rd 1989, Alicia Danette Rodden or Roden R-O-D-E-N, a female who was twenty two [*sic*] years old became the victim of a drive by type shooting. Miss Roden was particularly vulnerable as the innocent unarmed citizen who happened to be at the Allstar Inn on Sandy Beach Road in Vallejo California, when witnesses saw a group of black males drive into the parking lot and started shooting.  Multiple victims were attacked and one was killed in this same incident.  After some undetailed dispute that had occurred earlier in the evening in that location, possibly over a can of beer, between the males and one of the witnesses, Clifford Coot [*sic*] who may have been the target of the shooting.  The males returned to the scene and opened fire indiscriminately.  This offense was carried out in a dispassionate manner.  One shot, Mrs. [*sic*] Roden who was standing in the vicinity when the inmate shot out of the car with a silver color

---

[4] *Hayward*, 603 F.3d at 562.

[5] *Pearson v. Muntz*, 606 F.3d 606 (9th Cir. 2010) (per curiam), and *Cooke v. Solis*, 606 F.3d 1206 (9th Cir. 2010).

[6] *See* Rules—Section 2254 Cases, Rule 5(b).

pistol.  The car holding the inmate and his companions then fled the area.  Sir, you have no prior convictions but you certainly do have a history of approximately five years of substantial criminal behavior, including the sales of narcotics in California.  You've denied the sales of narcotics in Illinois, although we don't have any knowledge of that.  But you admitted and it's good that you have been frank with the panel, that you're admitting selling crack cocaine and also you've been a marijuana and alcohol abuser since the age of eight or nine.  So basically, just stating that you have no prior convictions belies the fact that you really do have a criminal history.  Your institutional behavior has been in some ways commendable and in other ways limited.  As to prison work, you're working in PIA laundry.  You have worked in the past in culinary.  You have achieved your GED in 1992.  As to your vocational certifications, you have one.  That's in masonry.  And you've worked in several other vocations and currently said you were planning to look at other vocations.  We have no laudatory chronos.  There was one general chrono that was read into the record.  You have a discontinuous record of AA participation.  You've been back in AA now for the recent two weeks but there was a hiatus there, that's H-A-I-A-T-U-S there for the transcriber, in which you did not participate in AA.  Although you clearly need to do so on a regular basis.  In 2004 you participated in the Phases program and 2005 and 2006 in Creative Conflict Resolutions, the Anger Management, which clearly you also needed to participate in.  So your self-help has been limited.  You have a record of nine 115s, the most recent in '98 for refusal to report to work. You have another drug offense in your history, a 115.  And the last l28a you had was in 1995 for refusal to obey an [*sic*] direct order.  As to the psychological report dated June 12th,

  **DEPUTY COMMISSIONER ZIEGLER:** Excuse me Commissioner. That was May of '99.
  **PRESIDING COMMISSIONER BRYSON:** For the l28?
  **DEPUTY COMMISSIONER ZIEGLER:** Yes.
  **PRESIDING COMMISSIONER BRYSON:** All right.  The psychological report dated June 12th of 2007 by Dr. M. Gecca G-E-C-C-A.  Dr. Geca [*sic*] assesses you as a low to moderate risk of violent recidivism and assess you at an overall LSCMI score indicating you're in the medium category of general recidivism.  So it is not totally supportive of your parole, although she does assess you as having a high Global Assessment Functioning of 90.  As to the parole plans, you have presented basically the plan of linking up with the San Francisco Muslim Community Center, which is not a plan that includes an employment offer, but it does include the assistance toward obtaining employment.  You have also presented alternative plans for Illinois with your sister or mother to live out of state.  But no employment plans in the out of state area at this time.  So you have, what we would say, incomplete parole plans.  And we would encourage you to develop them substantially.  It's not clear that your 1998 masonry skills would be the best marketable skills that you could have and

we would encourage you to work on another vocational certification. As to penal code 3042 responses. Responses indicate opposition to finding or parole suitability, specifically by the District Attorney of Solano County. In a separate decision, the hearing panel finds it's not reasonable to expect parole be granted at a hearing during the following two years. Specific reasons for this finding are as follows. [. . . .][7] Responding Vallejo PD Officers found Miss Rodden lying on her side, still breathing, a small amount of blood on her chest and stomach. Transported to the hospital by ambulance, she subsequently succumbed to gunshot wounds to the chest. This offense was carried out demonstrating callous disregard for human suffering, for public safety, certainly there were many people that could have been hit in this instance and you had opportunities to cease, including after the argument going back and retrieving the weapon in the first place. The motive for this crime moreover was very trivial in relation to the offense. It was evidently in some sort of retaliation. And you were later apprehended after the group, a few of the men and abandoned the vehicle in the Rodeo Area of Contra Costa County. Sir, you have told clinicians that you may or may not have been the shooter. Your prints were on the gun. Its pretty clear you were the shooter. You've been denying and minimizing your criminal history and the commitment offense to an extent that concerns this panel. Although we feel you've journeyed a better distance toward understanding the crime, but we don't feel you're there yet. You know, you told the clinician in the most recent psychological evaluation that you were trying to live a street life and you represented to this panel early in the hearing that you were trying to support and send money back to the children that you'd had by three women back in Illinois. But, explaining this, trying to live a street life, you told the clinician and I quote "you know you get money, cars and women and lots of people look up to you". [*Sic*] And then you said that despite accepting culpability, your sentence was not fair. You explained that you were not identified by a witness at first and then police cued in a witness by telling him what you were wearing. And you said, besides, the bullet that killed her did not match the gun I had. Well, this says to this panel that in fact you're still, in a very limited way, truly taking responsibility and that you still have a journey to understand the nature and magnitude so that you won't be a danger to society. And we feel that you need to continue on that journey. And that denying you parole for two years, we're placing you on the 2009 calendar for your next subsequent hearing. The board is recommending no more 115s or l28a's, that you do get self-help and that you immerse yourself in self-help programming. That you complete another trade and that you earn positive chronos. Commissioner Ziegler, do you have things to add?
**DEPUTY COMMISSIONER ZIEGLER:** Yes. I just want to commend you. You are doing well the last several years. The last seven, eight years. However,

---

[7] A recitation of the underlying commitment offense, which essentially repeats that recited earlier by the Board, is omitted in the interests of brevity.

you've been in prison since 1990. In fact it's seventeen years this month. You've only been disciplinary free for eight of those years. So really less than half of that time have you been disciplinary free. My other concern and I understand Mr. Gunning's philosophy that if you don't speak about the crime - nobody can interpret or misinterpret your statements. On the other hand, all I have is what's written then. I've never seen you before. I see inconsistencies in your acceptance of responsibility. Number one you said basically you were totally wasted and that you don't remember. Okay. I can accept that. But then you turn around and say something about a green sweater. Were you not wearing a green sweater? You said a witness was wearing a green sweater and apparently that didn't match what you had on. You, throughout both your board report and the psychological evaluation, you reiterated on several occasions 'I'm not saying I didn't shoot her and I am not saying I did shoot her'. [*Sic*] Then once again you take responsibility but in the board report you stated to your counselor that you think the people you were with were using you as a scapegoat because you only knew them a short time. And my other concern is that you are trying to put it behind you. You're trying not to dwell on it. You're trying not to think about it anymore. You have to think about it every single day of your life. You have to remember that woman's face. You have to think about did she have kids, did she have a mother, did she have a father, did she have brothers and sisters. You had just lost three of your family members. Think about what her relatives lost that day. And then once again, you think that the police officers pointed you out to the witness. And I got the impression you think he was coerced in - he or she - was coerced into identifying you. You say these things, making excuses and reasons why you don't think you - and then you think your sentence is too long. So on the one hand you're saying yeah, I did it. I'm guilty. But on the other hand you're saying, no, it wasn't really that bad and I was the scapegoat and they were forced to identify me. And it wasn't my bullet. Don't match, okay? They don't match. So, think about it. Either you need to accept responsibility, which you do. But if you're going to accept responsibility, accept full responsibility. I'm not telling you you have to admit to committing the crime if you truly believe you didn't commit it. But it's just inconsistent, both in all the reports and in the psychological evaluations. Okay? That's all I have. Thank you.[8]

In upholding the Board's decision, the Solano County Superior Court held:

>The Court finds the decision of the Board of Parole Hearings is supported by some evidence. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1094.) The Court's review is limited to determining whether some evidence supports the Board's decision. (*In re Rosenkrantz* (2002) 29 Ca1.4th 616.) As to Petitioner's other

---

[8] Docket No. 12-3, pp. 15-24.

claims, they fail to state ground [*sic*] on which relief can be granted by this Court. (*People v. Duvall* (1995) 9 Ca1.4th 464, 474.)[9]

In the Order requesting supplemental briefing, this Court directed the State to "specifically identify those characteristics, other than the underlying commitment offense, that support a finding that release of the Petitioner to parole status poses a current threat to public safety, and point to the specific evidence in the record that supports that determination." In order to preserve the issues for appeal, the State argues that California prisoners have no liberty interest in parole, and that if they do, the only due process protections available are a right to be heard and a right to be informed of the basis for the denial.[10] That is, the State contends that there is no due process right to have the result supported by sufficient evidence. Because they are contrary to binding Ninth Circuit law,[11] the State's arguments are without merit. In its response, the State identifies the factors, other than the underlying commitment offense, that the Board relied upon in denying Quarrels parole. The State also points to the evidence supporting those factors.

This Court must decide the case on the law as it exists at the time it renders is decision and, if the law changes while the case is pending, this Court applies the new rule.[12] Thus, although it establishes a new rule, the holding in *Hayward* is controlling. In this case, this Court "need only decide whether the California judicial decision approving the [Board's] decision

---

[9] Docket No. 12-1, p. 54.

[10] *See Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 15 (1979).

[11] *See Pirtle v. California Bd. of Prison Terms*, 611 F.3d 1015, 1020 (9th Cir. 2010); *Cooke*, 606 F.3d at 1213-14 (citing *Hayward*, 603 F.3d at 561-64); *Pearson*, 606 F.3d at 610-11 (same).

[12] *See Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 281-82 (1969); *Lambert v. Blodgett*, 393 F.3d 943, 973 n.21 (9th Cir. 2004).

rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or 'was based on an unreasonable determination of the facts in light of the evidence.'"[13] By its reference to § 2254(d), the Ninth Circuit implicitly, if not explicitly, directed this Court to apply § 2254(d) to the decisions of the California Supreme Court, using the same standards as are applied to the determination of the law as established by the United States Supreme Court.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."[14] The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[15] When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be objectively unreasonable, not just incorrect or erroneous.[16] The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that

---

[13] *Hayward*, 603 F.3d at 563 (footnotes citing 28 U.S.C. § 2254(d) omitted).

[14] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[15] *Williams*, 529 U.S. at 412.

[16] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

12

the state court determination was incorrect.[17]  Consequently, it appears that under the mandate of *Hayward*, this Court must canvas and apply California law as it existed at the time of the state court decision to the facts in the record as presented to the state court.

The mandate in *Hayward* is that this Court must review the decisions of state courts applying state law—in effect serving as a super-appellate court over state-court decisions.  This requirement is in tension with the holdings of the Supreme Court.  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.[18]  "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[19]  This principle applied to federal habeas review of state convictions long before AEDPA.[20]  A federal court errs if it interprets a state legal doctrine in a manner that directly conflicts with the state supreme court's interpretation of the law.[21]

---

[17] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[18] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[19] *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[20] *See Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

[21] *See Bradshaw*, 546 U.S. at 76-78 ("Because the Sixth Circuit disregarded the Ohio Supreme Court's authoritative interpretation of Ohio law, its ruling on sufficiency of the evidence was erroneous.").

At the time that the Board and the Solano County Superior Court rendered their decisions, the California "some evidence" rule was embodied in *In re Rosenkrantz*[22] and *In re Dannenberg*.[23] Subsequently, the California Supreme Court, applying *Rosenkrantz* and *Dannenberg*, decided *In re Lawrence*[24] and *In re Shaputis*.[25]

In *Rosenkrantz*, the California Supreme Court held:

> [. . . .] "Due process of law requires that [the Board's] decision be supported by some evidence in the record. Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board]. [. . . .] [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board] . . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision."[26]

The California Supreme Court then held:

> The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. (Citations omitted.) Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant. [. . . .]
> In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that

---

[22] 59 P.3d 174 (Cal. 2002).

[23] 104 P.3d 783 (Cal. 2005).

[24] 190 P.3d 535 (Cal. 2008).

[25] 190 P.3d 573 (Cal. 2008).

[26] *Rosenkrantz*, 59 P.3d at 218. Quoted with approval in *Shaputis*, 190 P.3d at 585.

offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ." (Pen.Code, § 3041, subd. (a).) "The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.) [¶] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date." ( Citation omitted.)[27]

In *Dannenberg* the California Supreme Court explained:

> [. . . .] So long as the Board's finding of unsuitability flows from pertinent criteria, and is supported by "some evidence" in the record before the Board [citing *Rosenkrantz*], the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders. Section 3041 does not require the Board to schedule such an inmate's release when it reasonably believes the gravity of the commitment offense indicates a continuing danger to the public, simply to ensure that the length of the inmate's confinement will not exceed that of others who committed similar crimes.[28]

The California Supreme Court then held:

> Thus, there clearly was "some evidence" (citing *Rosenkrantz*) to support the Board's determination that Dannenberg's crime was "especially callous and cruel," showed "an exceptionally callous disregard for human suffering," and was disproportionate to the "trivial" provocation. Accordingly, under *Rosenkrantz,* the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date.[29]

---

[27] *Rosenkrantz*, 59 P.3d at 222; *see Shaputis*, 190 P.3d at 584-85 ("The record supports the Governor's determination that the crime was especially aggravated *and*, importantly, that the aggravated nature of the offense indicates that the petitioner poses a current risk to public safety." (emphasis in the original)).

[28] *Dannenberg*, 104 P.3d at 795.

[29] *Id.* at 803.

The Board must, however, "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.[30] The Board "may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction evidences."[31] In *Lawrence*, however, the California Supreme Court rejected the argument "that the aggravated circumstances of a commitment offense inherently establish current dangerousness," holding:

> [W]e conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.[32]

This is the clarification upon which *Hayward*, *Pearson*, and *Cooke* rely, and it was the language in *Lawrence* to which this Court alluded to in its Order at Docket No. 17.

This Court must, therefore, determine whether the decisions of the California courts upholding the Board's denial of parole complied with California law as expressed in *Lawrence* and *Shaputis*. Because state-court judgments carry a presumption of finality and legality, Quarrels has the burden of showing by a preponderance of the evidence that he merits habeas

---

[30] *Id.* at 786-87, 802-803; *see Rosenkrantz*, 59 P.3d at 222.

[31] *Dannenberg*, 104 P.3d at 803 n.16 (citing *Rosenkrantz*, 59 P.3d at 219).

[32] 190 P.3d at 554-55; *see Cooke*, 606 F.3d at 1214.

relief.[33] Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[34] This presumption applies to state trial courts and appellate courts alike.[35] Both the subsidiary findings on the applicable factors and the ultimate finding of some evidence constitute factual findings.[36]

Although the decisions of the Board and the Solano County Superior Court predated the California Supreme Court decisions in *Lawrence* and *Shaputis*, the decisions of the California Court of Appeal and the California Supreme Court came after *Lawrence* and *Shaputis*. In his subsequent petitions for habeas relief to the California Court of Appeal and the California Supreme Court, Quarrels presented the same evidence and arguments that he had presented to the Solano County Superior Court.[37] Quarrels also submitted the decision of the Solano County Superior Court to the California Supreme Court. In its summary denial, the California Supreme Court is presumed to have decided the case on the merits,[38] and adopted the reasoning of the

---

[33] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[34] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[35] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

[36] *Cooke*, 606 F.3d at 1216.

[37] Under California's unique habeas procedure, a defendant who is denied habeas relief in the superior court files a new original petition for relief in the court of appeal. If denied relief by the court of appeal, the defendant has the option of either filing an original petition for habeas relief or a petition for review of the court of appeal's denial in the California Supreme Court. This is considered the functional equivalent of the appeal process. *See Carey v. Saffold*, 536 U.S. 214, 221-222 (2002).

[38] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam).

17

Solano County Superior Court.[39]  The California Supreme Court is also presumed to have correctly applied California law.[40]  This presumed adoption of the reasoning of the Solano County Superior Court conclusively establishes that the California Supreme Court was of the opinion that the Board's decision did not violate the California "some evidence" rule as stated in *Lawrence* and *Shaputis*.  Further argument on that issue is, therefore, foreclosed.[41]

Even if this Court were to independently review the decision of the Solano County Superior Court, the result would not change.  With respect to the underlying commitment offense, the applicable regulation provides:

> (1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> (C) The victim was abused, defiled or mutilated during or after the offense.
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.[42]

The evidence clearly supports a finding that this case falls within the scope of (1)(A) and (1)(E), and possibly falls within the scope of (1)(D).  Under California law, a court neither re-weighs the evidence nor substitutes it's discretion for that of the Board.  Judicial review of a

---

[39] *Ylst*, 501 U.S. at 802-03.

[40] *See Estelle*, 502 U.S. at 67-68; *Walton,* 497 U.S. at 653; *Engle*, 456 U.S. at 119; *Bell,* 543 U.S. at 455.

[41] *See Bradshaw*, 546 U.S. at 74, 76-78.

[42] Cal. Code Regs., tit. 15 § 2402(c).

decision denying parole is "extremely deferential."[43]  Thus, under *Rosenkrantz-Dannenberg*, this Court could not say that the decision of the Solano County Superior Court was contrary to, or involved an unreasonable application of California law at the time it was decided, or was based on an unreasonable determination of the facts in light of the evidence.  On the other hand, because *Hayward*, *Pearson*, and *Cooke* require that *Lawrence* and *Shaputis* be applied, this Court must look to determine whether there was some factor in addition to the underlying commitment offense to support denial of parole.

As the State points out in it supplemental response, in addition to the underlying commitment offense, the Board relied on Quarrels's limited participation in programming, self-help activities, and substance abuse programs while incarcerated, a psychological evaluation rating him as low to moderate for violent recidivism, and incomplete parole plans.[44]  The psychological evaluation, standing alone, is a sufficient additional factor to support the Board's finding of an unreasonable risk of danger to society or a threat to public safety.[45]  Accordingly, this Court need not address the adequacy of the additional factors cited by the Board.

V.  CONCLUSION AND ORDER

Quarrels is not entitled to relief on the ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

---

[43] *Rosenkrantz*, 59 P.3d at 210.

[44] Docket No. 18, p. 8.

[45] *Hayward*, 603 F.3d at 563.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[46] Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[47]

The Clerk of the Court is to enter final judgment accordingly.

Dated: December 3, 2010.

                                            /s/ James K. Singleton, Jr.
                                            JAMES K. SINGLETON, JR.
                                            United States District Judge

---

[46] 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (a COA should be granted where the applicant has made "a substantial showing of the denial of a constitutional right," i.e., when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks omitted).

[47] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.